# Supreme Court of Florida

_____

No. SC14-1200
_____

**PAT BAINTER, et al., AS NON-PARTIES,**
Appellants,

vs.

**LEAGUE OF WOMEN VOTERS OF FLORIDA, et al.,**
Appellees.

[November 13, 2014]

PARIENTE, J.

The narrow issue we address is whether the trial court erred by ordering the production of 538 pages of documents subpoenaed in a challenge to the constitutional validity of the Florida Legislature's 2012 congressional redistricting plan.[1]  We affirm the trial court's ruling.  We hold that any objection to the production of these documents based on a qualified First Amendment privilege has

_____

1.  We accepted jurisdiction of this appeal of the trial court's discovery orders involving these documents, under article V, section 3(b)(5), of the Florida Constitution, after the First District Court of Appeal passed through the appeal to this Court.  See Non-Parties v. League of Women Voters of Fla., 39 Fla. L. Weekly D1300, 2014 WL 2770013, at *1 (Fla. 1st DCA June 19, 2014).

been waived.  We reach this conclusion after a detailed examination of the record regarding the litigation of this discovery issue, which clearly and conclusively demonstrates the inexcusable delay of non-parties Pat Bainter and his political consulting firm, Data Targeting, Inc., in asserting this qualified privilege.

Our holding of waiver is based on the totality of the circumstances in this case and not on any one particular factor.  Those circumstances began when Bainter did not file a motion for a protective order or raise any legal objection to producing the documents when served with a subpoena duces tecum including these disputed documents within its scope.  Instead, Bainter attended a deposition, during which he affirmatively testified under oath that he had conducted "a thorough search" for documents in response to the subpoena and had produced what he found.

Then, after being served with additional subpoenas duces tecum including these disputed documents within their scope, the non-parties did not raise any claim of a First Amendment privilege during six more months of hearings and filings regarding document production.  Not until the day after the trial court held the non-parties in contempt of court and ordered them to pay attorney's fees for failing to produce the documents did the words "First Amendment" appear for the first time in a filing or a hearing transcript in the trial court.

The non-parties' belated claim of a qualified First Amendment privilege also was asserted only after they had previously sought a writ of certiorari from the First District Court of Appeal to prevent the discovery of the disputed documents, not once raising in that certiorari petition that the documents contained privileged communications or, as they now claim, that they needed more time to review the documents for privileges. Instead, until they were held in contempt of court, the non-parties' objections to production of these documents were based solely on the claimed irrelevancy and burdensome nature of the discovery requests.

However, the trial court consistently ruled that these documents were relevant as important circumstantial evidence of the claim that Bainter and other political consultants engaged in "a parallel redistricting process" to the open and transparent process championed by the Legislature, which was "conducted in the shadows" in an effort to "subvert[] the public process" and produce an unconstitutional "partisan map favoring Republicans and incumbents." League of Women Voters of Fla. v. Data Targeting, Inc., 140 So. 3d 510, 513 (Fla. 2014). For his part, Bainter denied that this had occurred, stating in his sworn deposition in November 2012 that his involvement in the 2012 legislative redistricting was merely based on "intrigue" or an "after-the-fact interest" in the outcome and something he was involved with purely for the sake of his own "[k]nowledge."

In other words, Bainter did not assert, as he does now, that the documents implicated his right to associate with others to submit redistricting maps through the public process. Instead, he denied submitting any maps through the public process, described himself as simply an "observer" in the 2012 legislative redistricting, and testified during his deposition about his firm's drafting and analysis of redistricting maps without ever once stating that he might possess any privileged communications.

We simply do not countenance and will not tolerate actions during litigation that are not forthright and that are designed to delay and obfuscate the discovery process. As this Court has long stated, full and fair discovery is essential to the truth-finding function of our justice system, and parties and non-parties alike must comply not only with the "technical provisions of the discovery rules," but also with "the purpose and spirit of those rules in both the criminal and civil context." Scipio v. State, 928 So. 2d 1138, 1144 (Fla. 2006) (citing Binger v. King Pest Control, 401 So. 2d 1310, 1314 (Fla. 1981)).

Accordingly, concluding that the non-parties' claim of a trade secrets privilege against production is also without merit, we affirm the trial court's ruling requiring the production of the 538 pages of disputed documents.[2] Because we

_____

2. The trial court subsequently entered a final judgment in the underlying litigation, finding constitutional violations of article III, section 20, of the Florida Constitution, which prohibits redistricting with the intent to favor or disfavor a

reject the non-parties' appellate claims of error, and in accordance with the overriding public interest favoring openness to judicial proceedings and records, we direct that the 538 pages of documents currently under seal should be made part of the public record and that the sealed portions of the trial transcript, ordered sealed by this Court to preserve the status quo during the pendency of the trial and this appeal, should be and hereby are ordered unsealed. Not only is there no legally valid reason at this time for allowing these documents or the testimony admitted at trial under seal to be hidden from public view, but this Court is committed to the principle that "all trials, civil and criminal, are public events and there is a strong presumption of public access to these proceedings and their records." Barron v. Fla. Freedom Newspapers, Inc., 531 So. 2d 113, 114 (Fla. 1988).[3]

political party or an incumbent. In response to the final judgment, the Legislature adopted, and the trial court thereafter approved, a remedial redistricting plan. The final judgment and the remedy ordered and approved by the trial court are the subject of a separate appeal and cross-appeal. The First District certified, pursuant to article V, section 3(b)(5), of the Florida Constitution, that the trial court's final judgment is of great public importance and requires immediate resolution by this Court. See League of Women Voters of Fla. v. Detzner, No. 1D14-3953, 2014 WL 4851707, at *2 (Fla. 1st DCA Oct. 1, 2014). We accepted jurisdiction. See League of Women Voters of Fla. v. Detzner, No. SC14-1905, 2014 WL 5502409, at *1 (Fla. Sup. Ct. order filed Oct. 23, 2014). We express no opinion at this time as to any of the issues that are the subject of that separate appeal and cross-appeal.

3. Numerous media organizations that regularly covered the underlying litigation and the broader redistricting controversy, as well as a nonprofit freedom of information advocacy group and a professional association for news editors,

- 5 -

# I. THE HISTORY OF THE DISCOVERY DISPUTE

The issue before the Court is whether the trial court erred by ordering the production of 538 pages of documents in the possession of non-parties to the redistricting litigation. We use the term "non-parties" to refer to all of the appellants in this proceeding, which consist of Pat Bainter, the president of Data Targeting, Inc., a political consulting company; two Data Targeting employees—Bainter's assistant and a computer programmer; and the company itself. The Legislature, which was the primary defendant in the trial court during the underlying redistricting litigation, is not a party to this proceeding. Neither is the Florida State Conference of the National Association for the Advancement of Colored People (NAACP), which was an intervenor-defendant in the underlying litigation, or the Florida Secretary of State or Attorney General, who were also named defendants in the trial court.

Data Targeting is a political consulting company that provides strategy, polling, and a host of related campaign services to legislators and candidates for

---

filed an amici curiae brief in this Court in support of unsealing the documents. Those organizations included: (1) the Associated Press; (2) the Bradenton Herald, Inc.; (3) the First Amendment Foundation; (4) the Florida Society of News Editors; (5) Gannett Broadcasting, Inc.; (6) Gannett Co., Inc.; (7) Halifax Media Group, LLC; (8) Media General Operations, Inc.; (9) Miami Herald Media Co.; (10) Morris Communications Corp.; (11) Orlando Sentinel Communications, LLC; (12) Scripps Media, Inc.; and (13) Sun-Sentinel Co., LLC.

public office who are affiliated with the Republican Party. These disputed documents, which the non-parties belatedly asserted are privileged under the First Amendment and as trade secrets, were subpoenaed in support of the central claim in the underlying redistricting litigation that Bainter and other political consultants acted in concert with the Legislature to produce individual districts and an overall redistricting map favorable to the Republican Party and incumbents, in violation of the Florida Constitution's redistricting standards.

We comprehensively set forth the history of the two-year protracted litigation over the documents in question to highlight the way in which the non-parties thwarted the discovery process. The litigation surrounding these documents began on September 13, 2012, when the individuals and groups challenging the constitutional validity of the 2012 congressional redistricting plan ("the challengers")[4] issued a subpoena duces tecum for deposition to Bainter. This subpoena provided that Bainter was "to bring to the deposition any document in [his] possession or control that relates to or discusses" any of the following:

---

4. The history of the underlying litigation and a detailed overview of the nature of the challengers' constitutional claims is contained in this Court's decision in League of Women Voters of Florida v. Florida House of Representatives, 132 So. 3d 135 (Fla. 2013), in which this Court recognized a legislative privilege but held that this qualified privilege must yield to permit the discovery of relevant information and communications, including the testimony of legislators and legislative staff members, pertaining to the constitutional validity of the challenged redistricting plan.

1. Congressional redistricting in Florida in 2012;

2. Congressional redistricting maps (whole or partial, completed or draft) that were:

    a. submitted to or discussed with any legislator, legislative staff member, or any legislative committee; or

    b. submitted to or discussed with any person with the intent that the person would convey it to any legislator, legislative staff member, or any legislative committee submitted to, considered by or passed by the Florida Legislature;

3. Any communication with any person about the subjects described in 1 and 2 above;

4. Any knowledge you have about:

    a. the method or process by which the 2012 Florida redistricting maps were drawn;

    b. any person who was involved in any way in drafting any map or district that was submitted to any legislator, legislative staff member, or to any legislative committee.

This subpoena clearly included within its scope the 538 pages of disputed documents at issue in this case. The subpoena issued to Bainter in September 2012 was never amended during the course of the litigation over the documents in question.

Bainter did not file a motion to quash the subpoena. He did not seek a protective order. Nor did Bainter otherwise raise any legal objection. Instead, fully two months after the issuance of the subpoena, on November 14, 2012, Bainter participated in a deposition, with an attorney present, and produced a set of

733 pages of documents that he asserted were responsive to the subpoena—but that, as the trial court later determined, did not include many documents in his possession that were within the scope of the subpoena.

Under deposition questioning, Bainter stated that he had "searched all of the areas that I have available to me" and was "confident" he "did a thorough search and did the best I could to produce" what was requested in the subpoena, including searching for communications with individuals he knew he had spoken to about redistricting. In further answers to deposition questioning about his role in the 2012 legislative redistricting, Bainter denied submitting any maps to the Legislature and described his involvement in the redistricting process as mere "intrigue" and an "after-the-fact interest."

Significantly, Bainter discussed his analysis of draft redistricting maps, which he described as something done out of "intrigue" or "interest," without ever asserting that he possessed or might possess any privileged communications. Bainter's sworn deposition did not assert, as he does now, that he wanted to submit redistricting maps as a private citizen for the Legislature's consideration as part of the public process—even anonymously. Rather, he stated that any actions he and his company had engaged in related to the legislative redistricting were simply for their own personal and professional interest in the process.

Specifically, Bainter stated under oath at his deposition that his involvement in the 2012 redistricting process was an "after-the-fact interest" similar to "watching a Sunday morning talk show" or "watch[ing] the first three-quarters of a football game" because, even though "all you want to know is the outcome," you still watch the whole game. When pressed as to the purpose being served by his company and other political consultants creating, analyzing, and sharing redistricting maps, Bainter at one point said, "Knowledge," and at another time said, "Intrigue."

The following excerpt from Bainter's deposition is illustrative of his sworn assertions at that time regarding the nature of his involvement in the 2012 redistricting process:

> Q: Do you recall Rich Johnson (sic) [another political consultant] drafting maps?
> A: Yeah.
> Q: How many?
> A: I don't know. A few.
> Q: What did he do with them?
> A: Traded them back and forth with me.
> Q: And what else? What was the purpose of this map drawing process?
> A: Interest. Mostly interest on our part.

When the challengers further inquired as to why he and his company were "engaged at this level of making specific changes to specific maps that . . . according to [his] testimony, were not being submitted to the legislature," Bainter stated that he "wasn't making any specific changes to any maps" and that he did

- 10 -

not "know towards what purpose" his employees were working on maps. After being asked repeatedly to answer what "professional purpose" was being served by working together with other political consultants on a map "that was never intended to be submitted to the legislature," Bainter stated that the purpose was, "Knowledge," and, when asked if there was "[a]ny other purpose," he responded, "I've done my best."

Simply put, Bainter did not assert during his sworn deposition, as he now does, that he and Data Targeting were drafting and analyzing redistricting maps in order to petition the government on the issue of redistricting, even anonymously, and that the challengers should not be able to discover documents revealing those communications. He likewise did not assert, as he now does, that his communications with other political consultants regarding the issue of redistricting implicated his First Amendment freedom of association. Nor did he assert, as he now does, that his communications regarding redistricting—communications for which he had conducted "a thorough search"—revealed proprietary, trade secret information or information about "grassroots" networks.

In fact, Bainter's position regarding the nature of his involvement in the 2012 redistricting process has changed dramatically from the time of his deposition to the present point in the litigation. While his attorney during oral argument in this Court stated that Bainter was participating in the redistricting process "just like

any other citizen" and "submitting maps through the public portal" under a First Amendment right to petition his government, Bainter himself, under oath at his deposition, actually <u>denied</u> ever submitting a map through the public process. Instead, he repeatedly responded that "intrigue," "interest," or "[k]nowledge"—not a desire to submit maps anonymously—was the purpose of his and his firm's creation and analysis of draft redistricting maps. In other words, despite what he now claims, Bainter's sworn assertions at the time of his deposition were that he was simply an "observer" in the redistricting process, someone who was just watching what transpired as in the first three quarters of a football game, analyzing the maps that were submitted through the public process for his own "after-the-fact" professional and personal interest, and that the purpose of his and Data Targeting's map drawing was nothing more than "intrigue," done for his and the company's own "[k]nowledge."

After Bainter's deposition, the challengers issued subpoenas duces tecum on November 16, 2012, to two Data Targeting employees that Bainter testified were involved in communications about redistricting and to the records custodian for the company, seeking the identical types of documents described in the September subpoena issued to Bainter. Again, these subpoenas sought "any document in your possession or control that relates to or discusses . . . Congressional redistricting in Florida in 2012."

Following this second round of subpoenas, Bainter, the two employees, and the company filed a motion to quash "all subpoenas duces tecum for depositions and production of documents served" on them, asserting that the subpoenas were "premature," "unreasonable," "unduly burdensome," "oppressive," and tantamount to a "fishing expedition" for information that was "not relevant" to the case and the central issue of legislative intent in the enacted redistricting plan. Significantly for our purposes of finding waiver, the motion to quash did not include any claim of either a First Amendment or trade secrets privilege.

The trial court held a hearing on the motion to quash on December 19, 2012, during which the non-parties principally focused their arguments on the claimed irrelevancy of any documents in their possession to the issues in the case and the claimed burdensome and broad nature of the discovery requests. They asked the trial court to, at the very least, limit the subpoenas "to only communications with legislative members and/or staff."

During the hearing, although not previously in their written motion, the non-parties briefly asserted that "a lot of the stuff that [Bainter] does in this business obviously is trade secret, confidential, privileged business information that the [challengers] have no interest in or no entitlement to." Once again, however, there was no mention of any asserted First Amendment privilege—much less a particularized claim, as they now make, that the subpoenas would require the

disclosure of the names, contact information, and internal deliberations of Data Targeting employees, clients, and other like-minded individuals regarding the redistricting process, thus infringing on the non-parties' right to freely associate with like-minded individuals in pursuit of a common goal to petition the Legislature regarding redistricting.

At the December 2012 hearing on the motion to quash, and in an effort to expedite and simplify the discovery process, the trial court asked the challengers to identify with more particularity the communications they were seeking, and held another hearing on January 28, 2013, at which the trial court attempted to foster agreement between the parties as to the types of communications that could be produced.[5] During this hearing, the non-parties continued to object to the discovery requests primarily on the basis of relevancy and the alleged burdensome and costly nature of the requests, but, after the trial court continually ruled against their relevancy objections, the non-parties stated that they would "make a good faith attempt to obtain the documents and research the documents, saving our objection on costs and trade secrets," though no specific trade secrets claim was made. Still, no First Amendment privilege was ever raised or asserted in any way.

---

5. We commend the trial judge for the proactive and professional manner in which he conducted the proceedings regarding this discovery dispute, including his efforts to encourage the parties to reach an agreement about the scope of the subpoenas and to facilitate timely discovery.

On January 30, 2013, the trial court entered an order denying the motion to quash but limiting the scope of the subpoenas duces tecum to documents dated, generated, or created between January 1, 2010, and the present, and requiring the challengers to provide an initial list of search terms consisting of "relevant specific persons" for whom the non-parties could "conduct a specific search for documents" involving these individuals, without prejudice to the challengers to later seek additional documents—all of which were within the scope of the September and November 2012 subpoenas. The trial court subsequently held several status hearings regarding document production, in February 2013, during which the trial court continued to rule against the non-parties' efforts to object to the alleged irrelevancy of the subpoenaed communications and continued to rule that the documents were relevant and must be produced. At no point in any of these hearings or in any filing did the non-parties assert a First Amendment privilege or make any specific claim regarding trade secrets.

Eventually, the non-parties produced 112 pages of documents, which were in addition to the 733 pages of documents Bainter had produced in response to the initial September 2012 subpoena but prior to filing the motion to quash. These 112 pages of documents produced at that time consisted of communications between the non-parties and either legislators or legislative staff, but did not include any communications between the non-parties and other individuals, such as

communications with other political consultants or other third parties interested in the redistricting process—even though those communications were within the scope of the subpoenas and the trial court had continually ruled those documents to be relevant and discoverable.

Based on the trial court's denial of the motion to quash and continued rulings that the non-parties must produce all responsive communications within the scope of the subpoenas, including those with other individuals outside the Legislature concerning redistricting, the non-parties filed a petition for a writ of certiorari in the First District, asserting that the trial court had "authorized discovery beyond the scope of matters reasonably calculated to lead to admissible evidence." Significantly, while the non-parties stated that disclosure would risk revealing "strategic ideas and action plans for responding to campaign issues triggered by redistricting changes," as well as "proprietary data analysis regarding redistricting intended for business purposes," no claims of a First Amendment or trade secrets privilege were raised.

Instead, the non-parties argued in their certiorari petition that the discovery requests sought documents that were irrelevant and that disclosure would cause irreparable harm to Bainter and his company. This petition for a writ of certiorari was denied, without elaboration, by the First District on July 17, 2013. Data

Targeting, Inc. v. League of Women Voters of Fla., 116 So. 3d 1266 (Fla. 1st DCA 2013).

On April 22, 2013, the date production was due under the trial court's rulings, and after the trial court and the First District had both denied the non-parties' motions to stay, the non-parties filed a "notice of status of production of documents" and motion for an order requiring confidentiality of production and the deposit for costs of production into a court registry. In this filing, the non-parties asserted that they had "reviewed the numerous documents returned from the electronic searches [they had conducted] for responsiveness, privilege, and other matters of confidentiality" and were "in a position to produce documents" satisfying the challengers' now seven-month-old discovery requests. (Emphasis added.) However, the non-parties stated that, "[o]utstanding from this available production," was "a small set of documents" that were "being recorded on a privilege log" for the challengers' review "as soon as practical."

The non-parties' filing asserted that the documents available for production at that time "constitute[d] private business communications between Non-parties and other private, non-legislative entities," and asked the trial court to keep all documents regarding "communication with non-legislative persons or entities" confidential, pending their then-outstanding petition for a writ of certiorari in the First District. No First Amendment privilege was asserted—the words "First

Amendment" did not even appear in the filing, despite the assertion that the non-parties had reviewed all documents for privileges—and no documents were actually produced.

In response to this notice, the challengers filed a motion for contempt and sanctions, contending that the non-parties had "purposefully, knowingly and willfully" failed to comply with the trial court's order requiring production of the documents by April 22, 2013. At a hearing on this motion on May 28, 2013, the challengers asked the trial court to, among other things, issue "an order that there has been a waiver of any and all objections, confidentiality, privilege and otherwise."

The trial court asked the non-parties to assert what "cat out of the bag" privilege they were claiming and also inquired as to what was "confidential" about the documents. Even though the non-parties' notice stated that all the documents had been reviewed for privileges by that time, their response to the trial court was that the documents were "irrelevant to the entire case," and, when pressed by the trial court as to the privileged nature of the documents, the non-parties stated that "the privileged nature is proprietary business information. Some of it's trade secrets."

Once again, we reiterate that at no time was the claim raised that the communications were protected under the First Amendment. The trial court did

observe, in reference to the cursory trade secrets assertion, that it "probably . . . could rule that [the non-parties] waived their claim for any kind of privilege" since they had failed for over eight months to assert any privilege in response to the initial discovery requests, but stated that the court was "going to wait and see."

At this May 28 hearing, the trial court held the non-parties in contempt of its prior order requiring production of the documents by April 22 and gave them until the day after the hearing to produce any non-privileged and non-confidential documents to the challengers and to also produce a privilege log, along with the withheld documents to the court for an in-camera review. In addition, the trial court awarded the challengers their attorney's fees for "not just this motion" because they "shouldn't have had to have been here for a lot of stuff."

The trial court's subsequent written order memorializing the hearing, entered on May 31, 2013, granted in part the challengers' motion for contempt and sanctions, holding the non-parties in contempt of the order requiring production of the documents by April 22 and awarding the challengers "their reasonable expenses, including attorneys' fees, incurred in obtaining the document discovery" from the non-parties. The trial court explicitly reserved ruling on "the confidentiality or privilege of any documents pending the completion of its in-camera review."

The day after the hearing at which the non-parties were orally held in contempt and ordered to pay attorney's fees, on May 29, 2013, the non-parties filed a notice of producing documents in response to the subpoenas duces tecum of September and November 2012. In that notice, the non-parties maintained, despite the trial court's consistent rulings on relevancy, that the subject documents were "wholly irrelevant" to the case and were being produced "only to avoid sanctions." The non-parties produced at that time an additional 166 pages of documents and, contrary to their prior assertion that only "a small set" of documents was being withheld, submitted a cursory privilege log indicating that they were withholding another 1,833 pages of documents—for the first time asserting that these documents were being withheld on the bases of "right of privacy" under article I, section 23, of the Florida Constitution;[6] "freedom of association" under the First Amendment to the United States Constitution; and as "trade secret[s]."

In other words, while the non-parties claimed in their May 29 motion for a protective order that the "First Amendment's associational privilege" applied to the disputed documents, this was the first mention of that privilege during the protracted litigation over these same documents. This motion was filed almost six

_____

6. The trial court immediately rejected the asserted "right of privacy" as a basis to preclude disclosure of the documents, and the non-parties did not challenge this finding or make any arguments on appeal concerning this claim.

months after the filing of their motion to quash the subpoenas and after Bainter asserted during his deposition that he had conducted "a thorough search" for responsive communications. It was filed more than eight months after the initial discovery requests. And it was filed only after the non-parties were held in contempt of court and ordered to pay attorney's fees. In moving for a protective order and an in-camera review of the documents, the non-parties stated for the first time that requiring disclosure of any of the 1,833 pages of withheld documents "would have a chilling effect on [their] ability to participate in the legislative process."

Many more months of hearings were subsequently held on the disputed documents, including referral at one point to a special master and the trial court's own in-camera review. At a hearing on April 29, 2014, in anticipation of the upcoming trial in the underlying case, the trial court orally stated that it was "prepared to rule on some documents that [the court] took to review in camera," including the 1,833 pages of disputed Data Targeting documents. The trial court stated that it was "doing the balancing" required under the qualified First Amendment associational privilege test "of the need for the information, how relevant, how important is it, and also to what extent does it invade upon the exercise of that First Amendment." The trial court then proceeded to orally list the 538 page numbers of the disputed documents that were, in the trial court's

estimation, discoverable—conditioning the release of these 538 pages of documents within the following week "to the plaintiffs' attorney and their staff and experts, but not to share with your clients or any third person unless and until it's utilized some way in these proceedings. So, confidential."

When asked by the non-parties whether the in-camera review also encompassed an analysis for trade secrets protection, the trial court responded affirmatively that this claim was also considered and rejected. The trial court's subsequent May 2, 2014, order memorializing its oral ruling at the hearing likewise explained that the trial court had "performed the balancing test required" in evaluating the qualified First Amendment associational privilege claim and had "also considered" the assertion of trade secrets protection, and that based on the trial court's "review, balancing and analysis," the qualified First Amendment associational privilege should yield as to 538 pages of the disputed documents.

In response to the trial court's May 2 order, which permitted the documents to remain confidential and ordered the documents not to be publicly disclosed at that time, the non-parties produced these 538 pages of documents to the challengers. However, after the trial court, on May 15, 2014, subsequently denied the non-parties' motion to close the courtroom to the public during any use of the documents at trial, the non-parties appealed the trial court's discovery rulings to the First District, which eventually passed through the appeal to this Court. See

Non-Parties v. League of Women Voters of Fla., 39 Fla. L. Weekly D1300, 2014 WL 2770013, at *1 (Fla. 1st DCA June 19, 2014). Therefore, we now consider this case as one of direct appellate review of the trial court's May 2014 discovery orders under our jurisdiction provided in article V, section 3(b)(5), of the Florida Constitution.[7]

## II. WAIVER

At the outset of our analysis, we reject the non-parties' attempts to raise new issues at oral argument and in a subsequent notice of supplemental authority, primarily on the question of waiver, that were not raised or discussed in the briefs.[8] The non-parties filed two briefs in the First District, which we accepted, and two supplemental briefs directly in this Court—the last three of which were all filed after the challengers fully set forth their argument for waiver in their answer brief.

---

7. We reject the challengers' claim that our review of the issues presented in this case is moot, either in light of the production of the subject documents; the admission of some of the documents into evidence at trial, on the basis of this Court's decision in League of Women Voters, 140 So. 3d at 512; or based on the trial court's final judgment in the underlying redistricting litigation. The non-parties' production of the documents to the challengers is an issue of waiver, not mootness, and the documents were permitted to be used at trial only because of this Court's intervening all writs opinion, which was specifically based on the understanding that this appellate review of the privilege claims would subsequently occur. See id. at 514.

8. By separate order, we denied the non-parties' motion for leave to file supplemental briefs as an improper attempt to insert new issues after oral argument into the appeal.

"Basic principles of due process"—to say nothing of professionalism and a long appellate tradition—"suggest that courts should not consider issues raised for the first time at oral argument" and "ought not consider arguments outside the scope of the briefing process." Powell v. State, 120 So. 3d 577, 591 (Fla. 1st DCA 2013); cf. Fla. R. App. P. 9.210(d) ("The reply brief shall contain argument in response and rebuttal to argument presented in the answer brief."). We will not do so here.[9]

Turning to the issues actually raised in the briefs and properly before us, the non-parties argue that the trial court erred in requiring production of the subject documents because those documents are privileged under the First Amendment and as trade secrets, and are thus exempt from compelled disclosure as part of the underlying redistricting litigation. We do not reach the merits of the asserted qualified First Amendment privilege, however, because we conclude based on the totality of the circumstances in this case that the non-parties' objections to production on this basis have been waived.

As our extensive recitation of the background of the discovery dispute reveals,[10] Bainter—who had control of all the challenged documents as president

_____

9. We note, however, that we have reviewed the cases cited by the non-parties in their notice of supplemental authority and, even if we were to consider them, we find them to be completely inapposite.

10. The entire record regarding this discovery issue was in place at the time the non-parties filed their notice of appeal in the First District. Therefore, it is unnecessary to reach the legal issue of whether the trial court's final judgment or

- 24 -

of Data Targeting—did not seek a protective order from the initial subpoena duces tecum served on him in September 2012 or raise any other legal objection to producing the subpoenaed documents. Instead, Bainter attended a deposition and affirmatively represented that he had conducted "a thorough search" for documents, including for communications between many of the individuals involved in the now-disputed documents, and stated that he had produced all documents at that time that he considered to be responsive.

For instance, when asked at his deposition whether he had produced all final or draft redistricting maps in his possession, Bainter stated, "I am testifying that I produced the maps that I found in [my] search," and that he was "confident" and "did a thorough search and did the best [he] could to produce for [the challengers]." He also testified that he "individually went through emails relative to people that I know that I may have discussed redistricting with," including some of the political consultants involved in the now-disputed documents, never once asserting that he found communications that were or might be privileged. Rather, Bainter stated that he had produced all the communications he found—even though it is clear from the documents under review that, as the trial court determined,

_____

any other events occurring after the notice was filed should be considered as a part of this appeal.

- 25 -

Bainter did not, in fact, produce all maps or relevant communications in his possession.

The non-parties contend that, after additional discovery requests were made following Bainter's deposition—the subpoenas duces tecum served in November 2012 on the records custodian for Data Targeting, as well as the two Data Targeting employees—"[m]onths passed in attempting to narrow the relevant search, including numerous hearings before the [trial court] where [the non-parties] acknowledged concerns regarding the burdens of the request and the likelihood of inherent privilege matters once potentially responsive documents were identified." Even assuming that the additional subpoenas in November 2012 triggered another responsive time period—despite the fact that those subpoenas were identical in scope to the September subpoena issued to Bainter—the non-parties still failed in their motion to quash the subpoenas or at the hearing on this motion to raise any claim of privilege.

In fact, not once during any hearing or in any written filing until being held in contempt of court six months after the second round of subpoenas were issued did the non-parties ever raise the claim that some of the communications might contain information that was protected by the First Amendment. In other words, while the non-parties' attorney stated during oral argument in this Court that the non-parties objected to the discovery as soon as they "became aware that these

inquiries were going far beyond what [they] deem[ed] to be tolerable," the legal

objections made even at that point were not based on privilege, but on relevancy

and the claimed burdensome and costly nature of the requests.

The trial court denied the non-parties' motion to quash the subpoenas at the

end of January 2013 and continually, over the course of many months of additional

hearings, ruled against their relevancy objections. After the motion to quash was

denied, the non-parties agreed to "work in good faith to obtain these e-mails,"

saving only their "objection on costs and trade secrets."

The non-parties did not assert that any documents were privileged under the

First Amendment until a motion for a protective order filed almost six months after

filing their motion to quash the subpoenas and eight months from the initial

discovery requests. Significantly, this was after they had already been held in

contempt of court for failing to comply with the trial court's prior orders requiring

production and after Bainter himself testified during his deposition that he had

thoroughly searched for communications involving people he talked to about

redistricting and had produced what he found. Nonetheless, when asked by the

trial court at the May 2013 hearing on the challengers' motion for contempt to

assert what privilege they were claiming, the non-parties again fell back on their

arguments that the documents were "irrelevant to the entire case" and that "the

privileged nature is proprietary business information," stating that "[s]ome of it's trade secrets" without mentioning, much less raising, a First Amendment privilege.

The non-parties did not assert that the communications might implicate the First Amendment or, as they now claim, that they needed to review the documents in greater detail to determine what privileges might apply. To the contrary, the non-parties asserted at the hearing that they had "all the documents" available for production but their objection was based on "the personal nature of it, it's their business information, it's their business communications" and continued, in the face of the trial court's repeated rulings, to object primarily on the basis of relevancy. The fact that they stated, "trade secrets," when pressed by the trial court to assert what privilege they were claiming is further indication that the First Amendment privilege claim was not timely raised.

The non-parties' statements that they were withholding only "a small set" of documents and were recording these on a privilege log were also ultimately belied by their subsequent withholding of 1,833 pages of documents and their submission of an extremely cursory privilege log that the trial court noted was "not very helpful" because it did not "identify the documents" or explain why a particular document was considered to be privileged for a particular reason. This is the very type of gamesmanship this Court simply will not tolerate during discovery.

Under Florida Rule of Civil Procedure 1.280, a party withholding information that is otherwise discoverable by claiming that it is privileged must "make the claim expressly" and "describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection." Fla. R. Civ. P. 1.280(b)(6). Regardless of whether the non-parties are considered "a party" under this rule, its rationale applies with equal force to this case—particularly once the trial court, repeatedly, determined that the disputed documents in the non-parties' possession were relevant and ordered the submission of a privilege log—and the non-parties did not expressly make their claim of privilege or produce a privilege log until many months after they withheld the documents. Cf. Century Bus. Credit Corp. v. Fitness Innovations & Techs., Inc., 906 So. 2d 1156, 1156-57 (Fla. 4th DCA 2005) (denying a petition for a writ of certiorari "directed to an order finding a waiver of privilege in regard to the production of documents because of the failure of the petitioner to file a privilege log," where "the log was not only months late, but found by the [trial] court to be 'completely inadequate' "); Kaye Scholer LLP v. Zalis, 878 So. 2d 447, 449 (Fla. 3d DCA 2004) (explaining that failing to comply with the procedural requirements of rule 1.280(b), including refusing to produce a

privilege log and delaying the production of documents, may result in the waiver of an asserted privilege).

As the challengers have aptly pointed out, the non-parties' argument that they timely asserted the privilege because they raised the claim once they "were finally able to review" the responsive documents for privileges, after narrowing the "broad scope of the subpoenas," is contradicted by the nature of the asserted privilege itself. The "blanket associational privilege" asserted "does not distinguish between the characteristics of any particular document," and thus, "there can be no reasonable claim that [the non-parties] had to collect and review the responsive documents to determine whether the privilege might apply." In fact, Bainter, who was involved in almost all of the communications revealed in these documents, never indicated at his deposition or in the motion to quash filed after his deposition—by which point the nature of the communications sought by the challengers was crystal clear—that he might possess privileged information.

Instead, as the challengers correctly assert, Bainter freely discussed the subject matter of the documents during his deposition without claiming any privilege whatsoever. Bainter's sworn testimony during his deposition that he and Data Targeting were drawing maps out of "intrigue" and "interest," and that this "keen[] interest[] in the process" was the only involvement he had in the 2012 legislative redistricting, is unsupported by a review of the disputed documents. In

fact, the documents support the challengers' claim that Bainter was not just drawing maps out of casual "after-the-fact interest," but was actively engaged in an extensive process to draw maps favorable to a particular political party or incumbent and facilitate the submission of those maps to the Legislature through "shell people" without any indication that the maps were drawn by the political consultants.

We point this out not to comment on the merits of the challengers' ultimate assertion that Bainter and other political consultants were actually engaged in a shadow process of creating maps with the intent to favor a political party or incumbent and facilitating the submission of those maps to the Legislature through other individuals, but rather to show that Bainter's deposition answers in November 2012 directly contradicted the documents that were eventually ordered produced and the arguments he now makes on appeal. Indeed, as the challengers' attorney stated during oral argument in this Court, if Bainter had acknowledged during his deposition or at any time in the months of litigation over these documents that he and Data Targeting were creating maps and anonymously submitting them to the Legislature, and had simply asserted at that time that the discovery requests were improperly aimed at ascertaining the strategy or process by which they went about doing so, there likely would have been much less need to "get into the details" or go through the documents. But Bainter denied that this

occurred, denied that he had ever submitted a map, and denied that he had any involvement in the redistricting process other than as an outside "observer."

By responding to the deposition questions and acknowledging discussions with other political consultants without ever revealing the true nature of those communications or asserting a First Amendment privilege, in conjunction with the failure to timely assert this qualified privilege after the deposition testimony and months of additional hearings, we conclude that Bainter waived his ability to later claim that the documents revealing these communications were privileged on that basis. Cf. Hoyas v. State, 456 So. 2d 1225, 1229 (Fla. 3d DCA 1984) (stating that "the privilege was intended as a shield, not a sword" and that "a party may not insist upon the protection of the privilege for damaging communications while disclosing other selected communications because they are self-serving" (quoting Int'l Tel. & Tel. Corp. v. United Tel. Co. of Fla., 60 F.R.D. 177, 185 (M.D. Fla. 1973)).

The district court of appeal cases cited by the non-parties from the 1980s regarding the timeliness of asserting a claim of privilege simply do not apply to the circumstances of this case, primarily because the courts in those cases were reluctant to require production of potentially privileged material when the litigant reasonably did not discover the privilege until some later time. See, e.g., Gross v. Sec. Trust Co., 462 So. 2d 580, 581 (Fla. 4th DCA 1985) (observing that, while

counsel "should have asserted privilege at the earliest time," the failure to do so when "no one had reviewed the tapes" ordered produced by the trial court, would not "prevent the trial court's in camera examination of the tape to determine if privilege exists"). Our facts are wholly distinguishable, in that the non-parties' current claim that they did not know any of the documents were privileged until the discovery requests were narrowed is entirely unsupported by the record, including Bainter's deposition answers; the non-parties' own response to the trial court when asked what privilege was being asserted after the non-parties stated that all documents had been reviewed; and the blanket nature of the asserted privilege itself.

The challengers also assert that waiver is warranted because the non-parties failed to exhaust their appellate remedies before producing the documents. As to this contention, the non-parties counter that they "faced a Hobson's Choice when confronted with [the trial court's May 2, 2014, production order under review]: either turn over the documents subject to the temporary confidentiality provision in the [order] and then appeal, or withhold the documents and face contempt of court before appealing and perhaps bringing the two-week trial to a halt." Yet, the non-parties <u>did</u> produce the documents prior to seeking appellate review of the trial court's May 2, 2014, order requiring production, and only sought appellate review

after the trial court subsequently denied their request to close the trial proceedings to the public during the discussion or use of any documents at trial.

Indeed, the non-parties' motion for confidentiality filed in the trial court after the documents were produced stated that "if no determination of confidentiality is made and these records are not sealed by this Court, [they] have no other remedy than to appeal the Court's [order requiring production] in order to protect the significant First Amendment interests and trade secrets implicated by the compelled disclosure of the Produced Data Targeting Documents." (Emphasis added.) In other words, it was the trial court's subsequent May 15, 2014, order, denying their request to close the trial proceedings, and not the May 2, 2014, order requiring production, with which they had already complied, that led the non-parties to initiate this appeal.

Although the trial court declined to find waiver based on a patient, "wait and see" approach at the time, we conclude after our review of the record that the non-parties failed to raise their qualified First Amendment associational privilege claim in a timely fashion and then failed to exhaust their appellate remedies before actually producing the documents. Our review of the record also indicates that the asserted First Amendment privilege claim could have been raised to the First District—but was not—when the non-parties filed their initial petition for a writ of certiorari challenging the trial court's denial of their motion to quash the

subpoenas, which the First District denied in July 2013.  See Data Targeting, 116 So. 3d at 1266.

While an unelaborated denial of a certiorari petition does not, standing alone, constitute an adjudication on the merits or establish law of the case, the failure to assert the privilege in that filing at the very least casts some doubt on the genuineness of the non-parties' current claim that disclosure will have a "chilling effect" on their First Amendment rights.  It is for this very reason that courts have long disfavored piecemeal appeals of related claims involving the same parties and same transactions, see generally Mendez v. West Flagler Family Ass'n, 303 So. 2d 1, 5 (Fla. 1974), and the non-parties' failure to raise the privilege in their prior petition for certiorari relief undermines the purposes of providing for interlocutory review of certain discovery issues, such as minimizing delay, decreasing costs, and conserving judicial resources.  Indeed, the failure to raise any claim of privilege in the non-parties' initial petition for a writ of certiorari to the First District challenging the trial court's denial of their motion to quash the subpoenas unduly delayed the litigation of this claim.  See Liberty Mut. Ins. Co. v. Lease Am., Inc., 735 So. 2d 560, 562 (Fla. 4th DCA 1999) ("[W]e do not countenance dilatory tactics in belatedly asserting a privilege claim.").

By failing to assert this qualified privilege sooner, the non-parties obfuscated the discovery process.  They now seek additional appellate review of additional

reasons not previously presented to the First District in the petition for a writ of certiorari or timely asserted in the trial court that they object to producing the same documents—all of which date back to the subpoenas that were legally served in September and November of 2012 encompassing these disputed documents. Cf. Bensonhurst Drywall, Inc. v. Ledesma, 583 So. 2d 1094, 1094 (Fla. 4th DCA 1991) (after a party did not appeal the denial of a motion for a protective order from certain discovery but then refused to permit the discovery at a deposition and filed a second motion for a protective order, the district court held that any petition for a writ of certiorari should have been filed after the first order denying the motion for a protective order). This is not the way either the discovery or the appellate process should work.

Accordingly, the totality of the circumstances clearly and conclusively establish that the non-parties have waived their defense to production on First Amendment grounds. Standing alone, this constitutes an adequate and independent basis under Florida law to reject the non-parties' First Amendment challenge to the trial court's rulings requiring production of the documents.

### III. TRADE SECRETS

In addition to claiming a qualified First Amendment privilege, the non-parties also allege that the vast majority of the documents constitute trade secrets and that the trial court committed a number of errors, both procedurally and on the

merits, in requiring the disclosure of their proprietary business information. While the totality of the circumstances would support a finding of waiver of any trade secrets privilege—as the trial court observed at the May 2013 hearing where it held the non-parties in contempt—we address the trade secrets claim on the merits because, unlike the asserted First Amendment privilege, the non-parties made a cursory assertion of trade secrets protection at a hearing on their motion to quash the subpoenas and then preserved this objection at a subsequent hearing where the motion to quash was denied.

However, although we address the trade secrets claim, we conclude for a number of reasons that it is without merit. First, the non-parties' claims of procedural error were not preserved. Contrary to their arguments on appeal, the non-parties never requested an evidentiary hearing on the trade secrets claim, and the trial court's order requiring production of the documents specifically stated that it had "considered" the non-parties' "assertion of trade secret protection" during its in-camera review of all 1,833 pages of disputed documents. Thus, even if preserved, the primary case law cited by the non-parties in support of their claim regarding the inadequacy of the trial court's procedures is completely distinguishable because in those cases, unlike here, there was no in-camera review. See, e.g., Am. Express Travel Related Servs., Inc. v. Cruz, 761 So. 2d 1206, 1210 (Fla. 4th DCA 2000) (remanding for an in-camera inspection of the material sought

and a determination of whether it constituted a trade secret); Salick Health Care, Inc. v. Spunberg, 722 So. 2d 944, 947 (Fla. 4th DCA 1998) (remanding for an in-camera hearing and inspection of the materials sought to determine whether they constituted trade secrets).

Moreover, during months of hearings and filings in the course of proceedings in the trial court, the non-parties never articulated with any particularity, even when prompted by specific questioning, why the documents should be considered trade secrets. The type of cursory and general assertion made by the non-parties regarding trade secrets was insufficient to satisfy their burden of establishing the privilege. See Am. Express Travel Related Servs., 761 So. 2d at 1209 ("The burden is on the party resisting discovery to show 'good cause' for protecting or limiting discovery by demonstrating that the information sought is a trade secret or confidential business information and that disclosure may be harmful.").[11]

Section 688.002(4), Florida Statutes (2014), defines a "trade secret" as a "formula, pattern, compilation, program, device, method, technique, or process" that derives actual or potential independent economic value "from not being

_____

11. Even when asked in an order issued by this Court to specifically identify which pages of disputed documents they continue to assert are protected trade secrets, the non-parties offered only vague and general claims and identified nearly every page of the disputed documents as allegedly containing trade secrets.

- 38 -

generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use" when it is "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." In this case, the trial court reviewed the documents and concluded that they did not qualify as trade secrets. Our own review of the documents gives us no reason to question this finding. See generally Health Care Mgmt. Consulting, Inc. v. McCombes, 661 So. 2d 1223, 1226 (Fla. 1st DCA 1995) (concluding that competent, substantial evidence in the record supported a trial court's finding that a "self-professed confidential methodology of presenting and interpreting Medicare regulations to clients in the home health care industry does not constitute a trade secret"). Accordingly, because the trial court's finding that the disputed documents do not constitute trade secrets is supported by competent, substantial evidence in the record, the non-parties' assertion of a trade secrets privilege does not prevent the production of the disputed documents.

## IV. CONCLUSION

This Court has, for years, held that a "search for truth and justice," as our court system and our constitution demand, "can be accomplished only when all relevant facts are before the judicial tribunal." Binger, 401 So. 2d at 1313 (quoting Dodson v. Persell, 390 So. 2d 704, 707 (Fla. 1980)). "Those relevant facts," this

Court has explained, "should be the determining factor rather than gamesmanship, surprise, or superior trial tactics."  Id.

In this case, the trial court repeatedly determined that the non-parties possessed relevant documents that were within the scope of the lawful discovery requests issued by the challengers, as authorized by the Florida Rules of Civil Procedure.  Yet, the non-parties defied the trial court's repeated rulings on relevancy and now seek to prevent the discovery on a basis not raised in the trial court until the day after the trial court held them in contempt of court for their failure to produce the documents.  The non-parties' belated assertions of a qualified First Amendment privilege have, based on the totality of the circumstances, therefore been waived.  In addition, their trade secrets claim is wholly devoid of merit.

Accordingly, we affirm the trial court's ruling requiring production of the 538 pages of disputed documents.  For all these reasons, and in accordance with the overriding public interest in openness to judicial proceedings and records, we direct that the sealed portions of the trial transcript, as well as the sealed documents themselves, should be and hereby are ordered unsealed.

It is so ordered.

LABARGA, C.J., and LEWIS, QUINCE, and PERRY, JJ., concur.
POLSTON, J., concurs in result with an opinion, in which CANADY, J., concurs.

- 40 -

**On the Court's own motion, any motion for rehearing shall be filed no later than 3 p.m. on November 20, 2014. See Fla. R. App. P. 9.330(a). Any response to a motion for rehearing must be filed no later than 3 p.m. on November 25, 2014. No reply to the response shall be permitted.**

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

POLSTON, J., concurring in result.

Although I do not concur fully with the portrayal of the background or with the entirety of the majority's analysis, I agree with the majority's holding that, under Florida law, the non-parties waived any First Amendment privilege by failing to raise it in a timely manner. See Kaye Scholer LLP v. Zalis, 878 So. 2d 447, 449 (Fla. 3d DCA 2004) (explaining that the failure to comply with Florida Rule of Civil Procedure 1.280(b) may result in the waiver of a privilege). I also agree with the majority that the non-parties' general assertion of a trade secrets privilege does not prevent production of the documents. See Charles W. Ehrhardt, Ehrhardt's Florida Evidence, § 506.1 (2014 ed.) ("The party invoking the privilege bears the burden of showing 'good cause' for protecting or limiting discovery by demonstrating that the information sought is a trade secret or confidential business information and that disclosure may be harmful."); see also Am. Express Travel Related Servs., Inc. v. Cruz, 761 So. 2d 1206, 1209 (Fla. 4th DCA 2000). I write separately to address federal law.

During oral argument, the non-parties asserted that federal law, not Florida law, governs the question of whether they waived their First Amendment rights. The adequacy of a waiver under state law to the assertion of a federal right is a matter of federal law. Lee v. Kemna, 534 U.S. 362, 375 (2002); Douglas v. Alabama, 380 U.S. 415, 422 (1965). But, under federal law, the question is whether state "practice gives litigants 'a reasonable opportunity to have the issue as to the claimed [federal] right heard and determined' by the state court." Parker v. Illinois, 333 U.S. 571, 574 (1948) (holding, in a discovery dispute, that waiver of First Amendment claim, under state law, was adequate under federal law) (quoting Cent. Union Tel. Co. v. City of Edwardsville, 269 U.S. 190, 194-95 (1925)); 16B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4028 (3d ed. 2014) ("The best interpretation of the cases, together, is that state procedure may be followed so long as it affords a reasonable opportunity to assert federal rights.").

In this case, the non-parties had a reasonable opportunity to have any claim of a First Amendment privilege heard and decided by Florida's courts. As the majority opinion explains in detail, the non-parties could have asserted, but failed to assert, their First Amendment claim before or during the deposition in November 2012, in their subsequent motion to quash the subpoenas duces tecum, during multiple discovery hearings in late 2012 and early 2013, and in their

certiorari petition to the First District Court of Appeal. When the non-parties decided to challenge production on the basis of relevancy, cost, and burdensomeness instead, the non-parties made a choice that involved waiving the First Amendment issue that they asserted much later in the proceedings. See Parker, 333 U.S. at 575 ("[P]etitioner plainly had a reasonable opportunity to have his federal questions passed upon by the state court. When petitioner acting through counsel decided to seek review in the [improper state] Appellate Court he made a choice which involved abandonment of the constitutional issues which he had raised in the proceedings."). Therefore, because Florida law provided the litigants with a reasonable opportunity to assert their federal rights but they failed to do so, the non-parties' waiver of their First Amendment claim under state law satisfies federal law.

Accordingly, I concur in result.

CANADY, J., concurs.

Certified Judgments of Trial Courts in and for Leon County – Terry Powell Lewis, Judge - Case Nos. 2012-CA-00412, 2012-CA-00490, and 2012-CA-2842 – An Appeal from the District Court of Appeal, First District, Case No. 1D14-2163

D. Kent Safriet and Mohammad Omar Jazil of Hopping Green & Sams, P.A., Tallahassee, Florida,

for Appellants

John Stewart Mills, Courtney Rebecca Brewer, and Andrew David Manko of The Mills Firm, P.A., Tallahassee, Florida; David B. King, Thomas Alan Zehnder, Frederick Stanton Wermuth, and Vincent Falcone, III of King, Blackwell, Zehnder

& Wermuth, P.A., Orlando, Florida; Mark Herron and Robert J. Telfer, III of Messer Caparello, P.A., Tallahassee, Florida; Raoul G. Cantero, III, Jason Nelson Zakia, and Jesse Luke Green of White & Case LLP, Miami, Florida; George T. Levesque, General Counsel, Florida Senate, Tallahassee, Florida; Charles Talley Wells, George N. Meros, Jr., Jason Lawrence Unger, and Andy Velosy Bardos of GrayRobinson, P.A., Tallahassee, Florida; Matthew Joseph Carson, General Counsel, Florida House of Representatives, Tallahassee, Florida,

for Appellees

Deanna Kendall Shullman, Mark Richard Caramanica, Allison Sinclair Lovelady and Carol Jean LoCicero of Thomas & LoCicero PL, Tampa, Florida,

for Amici Curiae (collectively "Media Organizations")